UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | |
|---|---|
| BILLY J. MALICOTE, <br>     Plaintiff, <br><br> V. <br><br> DON ALBERTO CORPORATION, *et al.*, <br>     Defendants. | CIVIL NO. 5:18-CV-29-KKC <br><br> **OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). [DE 9.] For the following reasons, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

For three years, Plaintiff Malicote was a night watchman at a Lexington, Kentucky thoroughbred horse farm known as Don Alberto Corporation ("DAC"). [DE 1, at 8.] Malicote, who was born in the U.S., claims he was discharged because of his national origin and in retaliation for suggesting that the employment practices of DAC violated the law.[1] [DE 1.]

---

[1] Plaintiff Malicote characterizes his own national origin, in addition to the national origin of similarly situated employees at DAC, as "American." [DE 1, at 8, 9.] Malicote also blanketly describes the collection of DAC employees who allegedly received preferential treatment as "Hispanics." It is not clear to the Court whether Malicote is alleging that these individuals are actually citizens of other countries or are instead U.S. citizens who possess the "physical, cultural, or linguistic characteristics of a particular national origin group." § 4:3.EEOC enforcement guidance on national origin discrimination, Corp. Compl. Series: EEO § 4:3 (2018-2019). Nevertheless, at this stage of litigation the distinction is irrelevant. And for the purposes of simplicity and clarity, the Court will refer to the class of individuals allegedly favored at DAC as "Hispanic" and will refer to Malicote and those similarly situated as "Non-Hispanic."

Malicote declares that on March 23, 2016, following a shakeup in DAC's management, Defendants Billy Rogers and George Mundy ascended to senior roles at the farm. Specifically, Mundy became the farm manager and Rogers became his assistant. [DE 1, at 9.] During that same month, Malicote claims that he was passed over for the position of broodmare manager, despite being more qualified than "Antonio," who was awarded the position. [DE 1, at 8.]

Malicote alleges that at the time Rogers and Mundy assumed control over the farm's operations, DAC employed twenty-three Hispanics and only four Non-Hispanics. [DE 1, at 9.] Further, Malicote maintains that from March 23, 2016 until his termination, there were several meetings and luncheons held exclusively for the Hispanic employees. Specifically, Malicote points to a February 2017 deportation meeting from which Non-Hispanic employees were allegedly excluded. [DE 1, at 9.]

On March 7, 2017, Malicote approached Mundy and asked if he should "call for an arbitrator from the E[E]OC, because he felt that he was being discriminated against." [DE 1, at 9.] In response, Mundy promised to set up a meeting with the secretary at which point Malicote indicated that such action "would be okay" with him. [DE 1, at 9.]

In the Complaint, Malicote alleges that in early March, 2017, he texted Rogers to inquire about the location of new check points that had been installed pursuant a newly enacted time clock procedure. Instead of responding to the text message, Malicote claims that Rogers instructed a co-worker to tell Malicote "not to worry about using the time clock." [DE 1, at 10.] Despite this, Malicote maintains that he adhered to the new time clock procedures in the days leading up to his termination.

On March 8, 2017, the farm secretary reached out to Malicote and informed him that she had been appointed as head of human resources. Malicote alleges that she asked him to attend a meeting on March 10, 2017. Although he was allegedly told that the meeting would

be private, when he arrived at the farm's headquarters, Estaban Penaloza, and "Antonio" were also there. Malicote was fired at the meeting.

Malicote states that he submitted his grievances to head of human resources before she fired him and that she glossed over his memorandum and stated, "[t]his doesn't matter, you are fired for not using the time clock." Further, Malicote claims that she hinted that the decision was not hers, but rather came from the corporate headquarters in Chile. [DE 1, at 10.]

After the meeting, Malicote telephoned Penaloza, who expressed surprise at Malicote's termination and suggested that Malicote hire "an attorney for discrimination." Malicote did not hire an attorney. Instead, he filed a complaint with the Lexington-Fayette Urban County ("LFUC") Human Rights Commission for national origin discrimination and retaliation. He also cross-filed his charge with the EEOC. Malicote's charge was dismissed by the LFUC Human Rights Commission on August 19, 2017 and by the EEOC on October 27, 2017. Specifically, the EEOC notified Malicote that it had adopted the finding of the LFUC Human Rights Commission and informed him of his right to sue. On January 24, 2017, Malicote filed this lawsuit.

## ANALYSIS

Defendants have now moved to dismiss all Malicote's claims in accordance with Fed. R. Civ. P. 12(b)(6). As to Malicote's claims pursuant to LFUC Local Ordinance 199-94, Defendants contend that no private right of action can exist under the Ordinance. Second, Defendants argue that the individual capacity claims asserted against Billy Rogers and George Mundy are precluded by Sixth Circuit precedent. Third, Defendants argue that the official capacity claims asserted against Rogers and Mundy are duplicative of the charges against DAC and should therefore be dismissed. Fourth, Defendants claim that Malicote's Title VII failure-to-promote claims are time-barred by the relevant statute. Fifth, Defendants

ask this Court to dismiss the Title VII national origin discrimination claims because Malicote fails to describe the nationality of those who negatively impacted his employment at DAC. And lastly, as to the retaliation claim under Title VII, Defendants maintain that Malicote fails to plead a causal connection between the protected activity and his eventual termination. For the reasons stated below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

I. **The Standard of Review**

The Federal Rules of Civil Procedure require a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ .P. 8(a)(2). In pro se matters, courts are to apply "less stringent" standards in determining whether Rule 8(a)(2) has been satisfied. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). This latitude, however, is limited. While courts apply less stringent standards in evaluating pro se pleadings, the plaintiffs are not automatically entitled to take every case to trial. *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996).

To survive a Rule 12(b)(6) motion to dismiss, the complaint must assert sufficient facts to provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal quotation marks and citations omitted) (second alteration in original). A complaint must also contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Twombly*, 550 U.S. at 570); *Rhodes v. R & L Carriers, Inc.*, 491 F. App'x 579, 582 (6th Cir. 2012).

A complaint should be dismissed pursuant to Rule 12(b)(6) if there is no law to support the claims, if the alleged facts are insufficient to state a claim, or if an insurmountable bar to relief exists on the face of the complaint. *See Browning v. Pennerton,* 633 F.Supp.2d 415,

429 (E.D. Ky. Jun. 22, 2009) (citing *Rauch v. Day & Night Mfg. Corp.,* 576 F.2d 697 (6th Cir. 1978). When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. *Drain v. Nicholson*, No. 1:07-CV-690, 2008 WL 123881, at *1 (S.D. Ohio Jan. 10, 2008). However, the Court "need not accept as true legal conclusions cast in the form of factual allegations if those conclusions cannot be plausibly drawn from the facts, as alleged." *O'Hair v. Winchester Police Dep't*, No. CIV.A. 5:15-097-DCR, 2015 WL 4507181, at *2 (E.D. Ky. July 23, 2015).

## II.     Claims Brought Under LFUC Local Ordinance 199-94

In his form complaint, pro se Plaintiff Malicote asserts that his action is brought, in part, pursuant to Local Ordinance 199-94 of the LFUC Human Rights Commission ("the Ordinance"). These claims must be dismissed because the Ordinance does not create private rights of action.

KRS § 344.300 authorizes the cities and counties of Kentucky to adopt and enforce prohibitions against the various forms of discrimination. Per the statute, LFUC enacted Local Ordinance 199-94—the language of which mirrors the Kentucky Civil Rights Act contained in Chapter 344 of the Kentucky Revised Statutes. *Lexington-Fayette Urban Cty. Human Rights Comm'n*, No. 2002-CA-001234-MR, 2003 WL 22271567, at *1, fn. 6. (Ky. Ct. App. Oct. 3, 2003).

While the Kentucky General Assembly granted municipalities the authority to prohibit forms of discrimination by local ordinance, it did not allow municipalities to create private rights of action for those injured by violations of such ordinances. *Roberson v. Brightpoint Servs.*, LLC, No. CIV.A. 3:07CV501-S, 2008 WL 793636, at *3 (W.D. Ky. Mar. 24, 2008). Other courts within the purview of the Sixth Circuit have reaffirmed this conclusion.

5

*See Price v. TJX Companies, Inc.*, No. 5:11-CV-319-JMH, 2012 WL 1565235, at *2 (E.D. Ky. May 2, 2012) (holding that "while Lexington–Fayette Urban Government Ordinance 201–99 does prohibit such discrimination, it does not create a private right of action in a court of law for violations of the Ordinance"); *see also Mickens v. Gen. Elec. Co.*, No. 3:16CV-00603-JHM, 2016 WL 7015665, at *2 (W.D. Ky. Nov. 29, 2016) (holding that Louisville-Metro Government Ordinance § 92.06 "does not create a private right of action").

As such, Local Ordinance 199-94 does not create private rights of action and Malicote's claims asserted thereunder must be dismissed as a matter of law.

### III. Title VII Claims Brought Against Defendants Mundy and Rogers in Their Individual and Official Capacities

Defendants argue that the Title VII claims brought against George Mundy and Billy Rogers in their individual and official capacities should also be dismissed. Specifically, Defendants assert that Title VII precludes individual liability and that "any effort to sue [Defendants] in their official capacities would be redundant" since the employer corporation, DAC, has already been named in the action. [DE 9-1, at 8.] These contentions are well taken.

As to the claims filed against the Mundy and Rogers in their individual capacities, the Sixth Circuit has held that "an individual employee[], who does not otherwise qualify as an employer, may not be held personally liable under Title VII." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) (internal quotations omitted). Moreover, even if Mundy and Rogers were effectively the supervisors of DAC, they would still not meet the statutory definition of "employer" under Title VII. *Hiler v. Brown*, 177 F.3d 542, 546 (6th Cir. 1999). Accordingly, Mundy and Rogers cannot be held personally liable under Title VII and Malicote's claims against them in their individual capacities must be dismissed.

The Court will also dismiss Malicote's claims against Mundy and Rogers in their official capacities. As an initial matter, the Court recognizes that the Sixth Circuit is yet to

rule on the legitimacy of official capacity suits brought against supervisors pursuant to Title VII. *Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001):

> [T]here is support for the proposition that a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the "alter ego" of the employer. This Court has not clearly and definitively ruled on this issue and we need not do so today;

*see also Grizzell v. City of Alexandria*, No. CIV.A. 14-50-DLB-JGW, 2015 WL 3463567, at *11 (E.D. Ky. June 1, 2015) (noting the Sixth Circuit's decision in *Little*). As done in *Grizzell*, this Court will assume that the claims against Mundy and Rogers in their official capacities are cognizable in the Sixth Circuit.

In the instant case, Malicote's Complaint indicates that Defendants Mundy and Rogers exercised varying degrees of control over the employment practices of the farm, such that they could potentially be considered the "alter ego" of DAC. *See Cautela v. Ohashi Tecnica U.S.A.*, Inc., No. 2:08-CV-960, 2009 WL 2431090, at *3 (S.D. Ohio Aug. 6, 2009). And since the Court must accept these factual allegations as true, Plaintiff's official capacity claims are not precluded per se. However, in exercising its discretion, the Court finds that the official capacity claims are entirely duplicative of the Title VII claims against DAC and add noting to the litigation. *See id.* The Title VII claims against Mundy and Rogers in their official capacities are dismissed accordingly.

## IV.     Malicote's Title VII Failure-To-Promote Claim

Defendants correctly assert that Malicote's failure-to-promote claim under Title VII should be dismissed as it is time-barred by 42 U.S.C. § 2000(e)(5).

To sustain a Title VII cause of action against an employer, the employee must first file a charge with the EEOC. If the employee instead decides to file the charge with the state equivalent, he must do so "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e); *Block v. Meharry Med. Coll.*, 723 F. App'x 273, 277

7

(6th Cir. 2018). Here, Malicote first filed his charge with a state equivalent of the EEOC, the LFUC Human Rights Commission, on April 3, 2017. Pursuant to the statute then, Malicote may not assert his claim based on any events taking place prior to June 7, 2016. As noted by the Defendants, the failure-to-promote claim derives from DAC's hiring of "Antionio" (instead of Malicote) for the broodmare manager position. This event allegedly took place in March of 2016, well before the cutoff period prescribed by § 2000e-5(e). As a result, Malicote's failure-to-promote claim is time-barred by § 2000e-5(e) and must be dismissed.

## V. Malicote's National Origin Discrimination and Retaliation Claims Under Title VII

Plaintiff Malicote maintains that he was discharged due to his national origin and in retaliation for suggesting that the hiring and employment practices of DAC were improper. Defendants, on the other hand, argue that both of these claims should be dismissed as a matter of law. For the reasons enumerated below, the Court will allow Malicote's Title VII national origin and retaliation claims against DAC to proceed.

Regarding Malicote's allegation that he was discriminated against on account of his national origin, Defendants contend that the claim should be dismissed because Malicote fails to identify the national origins of the individuals who negatively impacted his employment. [DE 9, at 11.] In doing so, Defendants misconstrue the burden that Malicote must satisfy to proceed with his national origin discrimination claim at this phase of the litigation.

It is true that Malicote must eventually satisfy a modified version of the *McDonnell Douglas* framework in order succeed with his reverse discrimination claim. *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985); *Hout v. City of Mansfield*, 550 F. Supp. 2d 701, 721 (N.D. Ohio 2008). At the motion to dismiss stage however, Malicote is not required to plead the elements of a prima facie case under the burden-shifting framework

of *McDonnell Douglas*, which "is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 506 (2002); *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 728 (6th Cir. 2009). Therefore, the ordinary rules for assessing a complaint apply and this Court must look to whether Malicote has "sufficiently pled" a national origin discrimination claim that is plausible on its face.

After a thorough review of the Complaint, the Court concludes that Malicote has met his burden with respect to his national origin discrimination claim. In particular, the Complaint alleges that DAC discriminated in favor of Hispanic employees in its employment practices, including the hiring, promotion, and termination of employees. [DE 1, at 9.] It also details specific events, including meetings and luncheons, where Non-Hispanic employees were excluded from meetings at the horse farm and asserts that Malicote received specific adverse employment actions notwithstanding his alleged satisfactory employment performances. Taken as a whole, these factual allegations regarding the national origin discrimination claim meet the burden set forth in Rule 8(a)(2). Malicote's national origin claim must proceed accordingly.

With respect to Malicote's retaliation claim, Defendants suggest that Malicote fails to show any connection between the protected activity and his termination from DAC. First, Defendants argue that Malicote was already on "thin ice" before presenting his grievances, via a memorandum, to the head of human resources. Second, Defendants suggest that Malicote's conversation with Mundy is irrelevant to the consideration of the retaliation claim since Mundy was far removed from the termination decision. The Court finds that these arguments are meritless.

Taking the facts in the Complaint as true, Malicote alleges that he was completely unaware of DACs intentions to fire him. In support, Malicote states that he followed the new time clock procedures implemented by DAC, despite the Defendants' allegations that he

failed to do so. Malicote further claims that the head of human resources fired him only *after* viewing the memorandum of grievances given to her by him. At a minimum, whether Malicote was on "thin ice" at DAC is in dispute. Yet at this juncture, the Court must construe the record in favor of Malicote. Therefore, Defendant's assertion that Malicote was trying to "stave off" termination in presenting his grievances is unpersuasive.

Next, while Defendants characterize Mundy as a veterinarian with no managerial responsibilities, Malicote claims that he was a key player in the decisionmaking apparatus of the horse farm. Of note, Malicote states that Mundy held the position of farm manager and that he, along with Rogers, was instrumental in hiring "Antionio" for the broodmare manager position. [DE 1, at 8.] Taking these allegations as true, the Court finds that Malicote has sufficiently plead the connection between the protected activity and the termination from employment. Specifically, there is a plausible link between Malicote's discussion with Mundy regarding DAC's employment practices, the head of human resources calling a meeting at the request of Mundy, and Malicote being terminated at said meeting. Therefore, Malicote's Title VII retaliation claim must proceed.

## CONCLUSION

The Court **HEREBY ORDERS** the following:

(1) Defendants' motion [DE 9] is **GRANTED IN PART** and **DENIED IN PART**.

(2) Plaintiff Malicote's claims brought under LFUC Local Ordinance 199-94 are **DISMISSED**.

(3) Plaintiff Malicote's claims brought against Defendants, Billy Rogers and George Mundy, in their individual and official capacities are **DISMISSED**.

(4) Plaintiff Malicote's failure-to-promote theory claim brought pursuant to Title VII is **DISMISSED**.

(5) Conversely, Malicote's national origin discrimination and retaliation claims under Title VII **SHALL PROCEED**.

Dated October 2, 2018.

*Karen K. Caldwell*
KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY